UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

                  Plaintiff,

-v-

ROBERT SIMON, *individually and in his
capacity as attorney-in-fact for MGV
Computer Holdings Inc.*, and MGV
COMPUTER HOLDINGS INC.,

                  Defendants.

18-CV-2257 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

In this action brought pursuant to 28 U.S.C. § 2201, New York company International

Business Machines Corporation ("IBM"), seeks a declaratory judgment to the effect that

(1) Canadian company MGV Computer Holdings, Inc. ("MGV") and its attorney-in-fact,

Canadian citizen and resident Robert Simon (together, "Defendants"), have released certain

contract claims against IBM as part of an earlier 2007 settlement agreement and (2) IBM is

entitled to recover attorney's fees and costs in the instant suit. Defendants, in turn, have filed

counterclaims seeking rescission of the 2007 agreement and judgment on their underlying

contract claims. IBM now moves for judgment on the pleadings, both as to its own claims and as

to Defendants' counterclaims. (Dkt. No. 27.) For the following reasons, IBM's motion is

granted in part and denied in part.

## I.      Background

### A.      Factual Background

The question at the heart of this case is whether MGV, through its attorney-in-fact,

Robert Simon, may bring certain breach-of-contract claims against IBM notwithstanding a

settlement agreement that IBM, MGV, and Simon entered into in 2007 in order to resolve an

earlier state-court litigation. The Court begins by describing the relevant terms of the underlying

contract. The Court then explains the earlier state-court litigation and the ensuing settlement

agreement before turning to the contract claims Defendants now wish to bring. In doing so, the

Court draws its recitation of the undisputed facts from the operative pleadings—IBM's amended

complaint (Dkt. No. 7), Defendants' answer and counterclaims (Dkt. No. 18 ("Ans." and "CC")),

and IBM's answer to the counterclaims (Dkt. No. 26)—and from those documents that are

attached to or incorporated by reference into the pleadings. *See Barnett v. Mount Vernon Police

Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order).

### 1. The Software Agreement

On August 17, 1995, IBM entered into a "Software Development Agreement" (the

"Software Agreement") with MGV. (Ans. ¶¶ 1, 10; Dkt. No. 29-1.) Under the agreement, MGV

agreed to develop certain software—which would later become known as "ACE" software—for

use in point-of-sale systems that IBM developed and licensed to retail establishments. (Ans.

¶ 10; CC ¶¶ 14–15; Dkt. No. 29-1 at 3, 62.) In return, IBM agreed as relevant to pay royalties

whenever it licensed a product that incorporated the ACE software. (Ans. ¶ 10; Dkt. No. 29-1 at

15, 79–80.) The amount of royalties IBM owed MGV was calculated as a function of IBM's

"Sales Revenue" (Dkt. No. 29-1 at 15), defined to encompass "revenue" and "all other income"

IBM derived from licensing the ACE software (Dkt. No. 29-1 at 6).

To ensure transparency in IBM's calculations of its revenues and royalties, the Software

Agreement required IBM to provide MGV with monthly royalty statements. (Dkt. No. 29-1 at

16). As a further safeguard, the Software Agreement provided that IBM and MGV could access

one another's records as often as once per year to perform an audit. (Dkt. No. 29-1 at 17.)

## 2.    The 2006 Action and the Resulting Settlement

In March 2006, Robert Simon, MGV's attorney-in-fact, filed suit ("the 2006 Action") against IBM in New York state court, alleging that IBM had breached the Software Agreement by understating the royalties it owed to MGV.  (Ans. ¶¶ 9, 11–12; *see also* Dkt. No. 7-4.) According to the operative complaint in that action, IBM had been attributing almost all of the revenues derived from its point-of-sale systems to the systems' hardware components—which triggered no royalty obligations—rather than to the systems' software components—which did trigger royalty obligations—even though generally accepted accounting principles and U.S. Securities and Exchange Commission guidance should have led IBM to allocate revenues more or less equally between hardware and software.  (Dkt. No. 7-4 ¶¶ 46–59.)  In addition, the complaint alleged, IBM had "under-recogni[zed] [the] maintenance fee and upgrade revenue" it derived from ACE products and so had "wrongfully withheld" royalties on that basis as well. (Dkt. No. 7-4 ¶ 60.)

To hide these alleged abuses, Simon contended, IBM had given MGV royalty statements that failed to "provide the information necessary to permit MGV or Mr. Simon to determine how much IBM actually owe[d] to MGV."  (Dkt. No. 7-4 ¶ 63.)  Moreover, IBM had allegedly "refused to provide [MGV] access" to certain records when MGV sought to exercise its audit rights under the Software Agreement (Dkt. No. 7-4 ¶ 69), with the result that the auditors were "unable to complete [their] audit report concerning the royalties actually payable to MGV" (Dkt. No. 7-4 ¶ 73).  As a remedy, Simon sought compensatory and punitive damages, as well as a declaration that IBM was obligated to pay royalties based on "the revenues actually generated in connection with" the ACE software and to "provide access to its complete and accurate accounting records on a continuing basis," so as to allow MGV and Simon to "determine the amounts actually owing to MGV" under the Software Agreement.  (Dkt. No. 7-4 at 25.)

After the New York Supreme Court dismissed certain of Simon's claims as time-barred (Ans. ¶ 15; Dkt. No. 29-3 at 12–14), IBM, Simon, and MGV entered into a December 31, 2007 Settlement Agreement and Release (the "Settlement") (Ans. ¶ 16; Dkt. No. 7-1). Under the Settlement, IBM agreed among other things to pay royalties under the terms of the Software Agreement for the last three months of 2007; to pay fixed sums in lieu of royalties for the years 2008 through 2011; and to commence paying royalties and providing royalty statements again under the terms of the Software Agreement at the start of 2012. (Dkt. No. 7-1 ¶¶ 1(b)–(g)). In exchange, MGV and Simon waived their right to audit any revenues earned by IBM prior to January 1, 2012, and agreed that during any audit of revenues earned after that date, the auditors would have access to only a limited set of specified documents. (Dkt. No. 7-1 ¶¶ 2(a)–(b), (g).) Moreover, the Settlement provided that in calculating the amount of royalties owed, the auditors would "apply IBM's methodology for apportionment of revenue." (Dkt. No. 7-1 ¶ 2(e).)

The Settlement also included a release of claims. In particular, the Settlement provided that Simon would discontinue the 2006 Action with prejudice and that the parties would release all other then-existing causes of action, "whether known or unknown, . . . hidden or concealed," that arose out of or related to "any of the facts or circumstances underlying the [2006] Action and any other matters related to ACE and/or the [Software Agreement]." (Dkt. No. 7-1 ¶¶ 3, 5(a)–(c).) As for future claims, the parties "waive[d] their rights to litigate future disputes that may arise relating to the calculation, payment of, or otherwise concerning, ACE Royalty Payments or [the relevant provision] of the [Software Agreement]." (Dkt. No. 7-1 ¶ 4.) Should such a dispute arise, "the aggrieved Party's only recourse [would] be to request an independent accounting firm to conduct an audit" under the terms of the Settlement "and to be bound by the Independent Auditor's conclusions concerning the ACE Royalty Payments." (*Id.*)

Finally, the Settlement provided that its releases were to be construed as a covenant not to sue and that any breach of the covenant would "entitle the party sued to recoup all attorneys' fees and other fees and costs incurred in the defense of any [prohibited] action." (Dkt. No. 7-1 ¶ 6.)

### 3. Defendants' Newly Discovered Contract Claims

The peace occasioned by the Settlement, however, did not last. According to Defendants, they learned of another longstanding, previously undisclosed breach of the Software Agreement after IBM transferred its rights and duties under the agreement to another company, Toshiba Global Commerce Solutions Holdings Corp. ("Toshiba"), in July 2012. (Ans. ¶ 22; CC ¶¶ 37–38.) Defendants maintain that a Toshiba employee's disclosure during a March 2016 audit of ACE-related accounting records led them to discover that Toshiba—and IBM before it—had been manually deducting from Sales Revenue certain revenues derived from selling technical support services for ACE products. (CC ¶¶ 38–40.) This practice, which Defendants contend breached the Software Agreement (CC ¶ 57), was allegedly so improper that at least one other Toshiba employee had resigned over it (CC ¶ 42), and that Toshiba's chief executive officer, when confronted about it, acknowledged that Simon had been "wronged" (CC ¶ 41).[1]

Because IBM had historically refused to provide MGV's auditors with sales documents for ACE products—citing confidentiality concerns that Defendants now deem pretextual—Defendants maintain that they had been unable to detect IBM's scheme while it was ongoing. (CC ¶ 44.) Accordingly, on February 14, 2018, Simon sent IBM a letter charging IBM with the "active concealment" of revenue from technical support services and requesting $16 million as redress for IBM's "past underpayment of the ACE Royalty" dating back as far as 1998. (Dkt.

---

[1] Defendants represent that Simon and Toshiba entered into a settlement agreement, not at issue here, to resolve Toshiba's liability for perpetrating this alleged scheme. (CC ¶ 41.)

No. 7-2 at 2–3; *see also* Ans. ¶ 23.)  Simon's letter acknowledged the Settlement but represented that it would "not be a barrier to recovery" in the event of litigation because it had been procured only through IBM's purportedly fraudulent concealment of its accounting practices.  (Dkt. No. 7-2 at 3.)  Indeed, Simon represented that his lawyers had drafted a legal complaint and would proceed to file it if IBM failed to respond.  (*Id.*)

IBM, however, did not respond to the letter.  Instead, it beat Simon to the punch by filing the instant lawsuit.

### B.    Procedural Background

IBM initiated the instant lawsuit on March 14, 2018 (Dkt. No. 1), and it filed the operative Amended Complaint against MGV and Simon, in his role as attorney-in-fact for MGV, on April 10, 2018 (Dkt. No. 7 ("Compl.")).  The operative complaint asserts two causes of action.  In Count One, IBM seeks a declaratory judgment from this Court pursuant to 28 U.S.C. § 2201, to the effect that Defendants' claims for additional ACE royalty payments are barred by the Settlement.  (Compl. ¶¶ 29–30.)  In Count Two, IBM seeks an award of attorney's fees and costs under the terms of the Settlement on the grounds that Defendants have breached the covenant not to sue.  (Compl. ¶¶ 32–35.)

Meanwhile, after IBM filed its complaint in this lawsuit, but before Defendants had filed an answer, Defendants initiated proceedings against IBM in New York state court by filing a summons.  (Ans. ¶ 28; *see also* Dkt. No. 7-3.)  Defendants, however, represent that they informed IBM that they did not intend to effectuate service of the summons (Dkt. No. 32-1 ¶ 4), and Defendants have since discontinued the state-court action without the summons having ever been served (Dkt. No. 28 at 8; Dkt. No. 32 at 9 n.3; Dkt. No. 32-1 ¶ 10).

Back in federal court, Defendants filed their answer in the instant suit, along with two counterclaims, on June 11, 2018.  (Dkt. No. 18.)  In Count One, Defendants seek rescission of

the Settlement, along with damages, on the ground that IBM procured the Settlement by fraud. (CC ¶¶ 48–52.)  In Count Two, Defendants assert that IBM breached the Software Agreement from 1998 to 2012 by misallocating revenues between hardware and software and by failing to include technical support revenues in its reported Sales Revenue, and they seek a consequent damages award of at least $16 million.  (CC ¶¶ 54–60; *see also* CC ¶ 52.)

IBM answered the counterclaims on July 23, 2018 (Dkt. No. 26), and, that same day, moved for judgment on the pleadings (Dkt. No. 27).  In connection with its motion, IBM seeks (1) a declaration that the Settlement is enforceable; (2) the dismissal of Simon and MGV's counterclaims; and (3) an award of attorney's fees and costs.  (*Id.*)  IBM's motion is now fully briefed (Dkt. Nos. 28, 32, 33), and is fit for resolution.

## II.    **Legal Standard**

Federal Rule of Civil Procedure 12(c) authorizes the Court to grant judgment on the pleadings "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings."  *Verragio, Ltd. v. AE Jewelers, Inc.*, No. 15 Civ. 6500, 2017 WL 4125368, at *4 (S.D.N.Y. Aug. 23, 2017) (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).  IBM is thus entitled to prevail on its motion "only if [it] establishes that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law," *id.* (alterations in original) (quoting *Mack v. Comm'r of Soc. Sec.*, No. 12 Civ. 186, 2013 WL 5425730, at *6 (S.D.N.Y. Sept. 27, 2013)), or, put another way, if it "can 'establish a set of facts that would preclude [Defendants] from obtaining relief," *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 290 (S.D.N.Y. 2012) (quoting *Barber v. RLI Ins. Co.*, No. 06 Civ. 630, 2008 WL 5423106, at *1 (N.D.N.Y. Dec. 24, 2008)).

In determining whether IBM has made this showing, the Court applies the "same standard" it would apply to a motion to dismiss Defendants' counterclaims under Rule 12(b)(6),

"accept[ing] all factual allegations in [Defendants' counterclaims] as true and draw[ing] all reasonable inferences" in Defendants' favor. *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)). If Defendants' allegations "state a claim to relief that is plausible on its face," *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 118 (S.D.N.Y. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), then the counterclaims may proceed, and IBM is not presently entitled to judgment.

## III.    Discussion

IBM maintains, and Defendants never dispute, that the contract claims Defendants now seek to assert fall within the ambit of the Settlement's release terms. (Dkt. No. 28 at 18–21.) To the extent that the claims accrued prior to the execution of the Settlement, then, Defendants appear to have released them (Dkt. No. 7-1 ¶¶ 5(a)–(b)), and to the extent that they accrued thereafter, it would seem that Defendants have "waive[d] their rights to litigate" them, such that Defendants' "only recourse" is to invoke the Settlement's audit procedures (Dkt. No. 7-1 ¶ 4).[2]

In light of these undisputed facts, IBM argues that it is entitled to the dismissal of Defendants' contract claims and to a judgment declaring that the Settlement bars Defendants from seeking further recovery of ACE royalties. (Dkt. No. 28 at 18–21.) Defendants, though, respond that they have plausibly alleged that the Settlement was induced by fraud and so should be set aside. (Dkt. No. 32 at 10–20.) Thus, Defendants go on, because they are entitled to proceed on their rescission claim, the fact of the Settlement cannot, at this stage, require dismissal of their contract claims. (Dkt. No. 32 at 21.) IBM, for its part, disagrees that

---

[2] The Settlement does contain an exception that would allow Defendants to file suit to enforce IBM's obligation to pay certain fixed sums contemplated by the Settlement. (Dkt. No. 7-1 ¶ 4.) Defendants have nowhere alleged, however, that IBM has failed to pay these sums.

Defendants' allegations of fraudulent inducement make out a plausible case for rescission and so maintains that the rescission claim must be dismissed as well. (Dkt. No. 28 at 11–17.)

Further, to the extent that the pleadings *do* establish the Settlement's validity as a matter of law, the parties dispute whether Defendants have breached the Settlement's covenant not to sue and thereby triggered IBM's right to collect attorney's fees and costs in this action. (Dkt. No. 28 at 21; Dkt. No. 32 at 21–25.)

The Court first addresses the question of rescission and then considers whether Defendants have breached the covenant not to sue.

### A. Rescission

The Court first asks whether the undisputed facts establish as a matter of New York law that the Settlement's release terms are valid and enforceable or, conversely, whether Defendants have pleaded facts that "plausibly give rise to an entitlement" to have the Settlement rescinded.[3] *Cont'l Cas. Co.*, 921 F. Supp. 2d at 118 (quoting *Iqbal*, 556 U.S. at 679).

Under New York law, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (quoting *Glob. Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 214 (App. Div. 1st Dep't 2006)). But "[a] release may be invalidated . . . for any of 'the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake.'" *Id.* (quoting *Mangini v. McClurg*, 24 N.Y.2d 556, 563 (1969)). Where, as here, a party seeks rescission of a release on the basis of fraud, that party must show "a representation of material fact, the falsity of that representation, knowledge by the party who

---

[3] The parties agree that New York's substantive law governs their dispute (Dkt. No. 28 at 12; Dkt. No. 32 at 10), and that agreement "is sufficient to establish choice of law," *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

made the representation that it was false when made, justifiable reliance by the [party seeking rescission], and resulting injury." *Id.* (quoting *Glob. Minerals*, 824 N.Y.S.2d at 214).

Defendants advance two theories as to why the Settlement was a product of IBM's fraud.

Defendants first argue that the Settlement "itself contained fraudulent misrepresentations, including misrepresentations regarding IBM's intent to calculate the ACE Royalty pursuant to the [Software Agreement]." (Dkt. No. 32 at 19.) After all, they maintain, IBM knew at the time it signed the Settlement that it had no intention, going forward, of calculating their royalties according to the method purportedly required by the Software Agreement. (Dkt. No. 32 at 20.) And because the New York Court of Appeals has long acknowledged that "a promise [that] was actually made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation of 'a material existing fact' upon which an action for rescission may be predicated," *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957) (quoting *Adams v. Gillig*, 199 N.Y. 314, 319 (1910)), Defendants reason, "IBM's representation that, for certain periods, it would calculate the ACE Royalty in accordance with the [Software Agreement] is alone a sufficient basis for the rescission claim" (Dkt. No. 32 at 12).

This argument misunderstands New York law. While it is true that New York law allows a party to ground a rescission claim on a false statement made at the time of a contract's execution regarding an intention to take future action, *see Sabo*, 3 N.Y.2d at 160, this principle applies only where the alleged false promise does not form part of the contract itself, *see Rabin v. MONY Life Ins. Co.*, 387 F. App'x 36, 40 (2d Cir. 2010) (summary order) (citing cases). Here, Defendants have not alleged that IBM made any promises at the time of the execution of the Settlement regarding future royalty calculations above and beyond the promises contained in the Settlement itself. Thus, Defendants are "simply dressing up a breach of contract claim by further

alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder," which is "insufficient to state an independent [fraud] claim" under New York law. *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (quoting *Best W. Int'l, Inc. v. CSI Int'l Corp.*, No. 94 Civ. 0360, 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994)).

The Court therefore turns to Defendants' second theory of fraudulent inducement—namely, their argument that the Settlement was fraudulently induced because, while negotiating the Settlement, IBM allegedly concealed the fact that it had been deducting—in supposed violation of the Software Agreement—certain technical support revenues from the Sales Revenue upon which MGV's royalties were based. (CC ¶¶ 48–51.) Consequently, Defendants were allegedly tricked into entering into the Settlement without a full appreciation of the relevant facts. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011) (recognizing that failure to disclose material facts can form the basis for a fraud claim).

IBM maintains that this argument fails as a matter of law for two reasons. First, IBM argues that, in releasing all claims, "whether known or unknown, . . . hidden or concealed" that arise out of or relate to any "matters related to ACE and/or the [Software Agreement]" (Dkt. No. 7-1 ¶¶ 5(a)–(b)), Defendants have released any claim that IBM fraudulently induced the Settlement by hiding the true value of its Sales Revenue (Dkt. No. 28 at 12–15). Second, IBM argues that Defendants have not plausibly alleged that they reasonably relied on an expectation that IBM would employ any particular method for calculating its Sales Revenue because they were aware at the time the Settlement was executed that IBM had not provided the underlying documents that would have shown how such calculations were being made. (Dkt. No. 28 at 15–17.)

The Court agrees with IBM on the first point and so need not address the second.

New York law allows parties to agree to a release that "emcompass[es] unknown claims, including unknown fraud claims, if the parties so intend and the agreement is 'fairly and knowingly made.'" *Centro Empresarial*, 17 N.Y.3d at 276 (quoting *Mangini*, 24 N.Y.2d at 566). As a result, "a party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release." *Id.*

Here, when entering into the Settlement, Defendants agreed to release IBM from all then-existing claims, "whether known or unknown, . . . hidden or concealed" that "aris[e] out of or relat[e] to . . . ACE and/or the [Software Agreement]." (Dkt. No. 7-1 ¶¶ 5(a)–(b).) Because any claim that IBM misrepresented its method of calculating Sales Revenue during the course of negotiating the Settlement falls within the scope of that release, New York law bars Defendants from relying on such a claim as the basis for rescission. *See, e.g.*, *Morefun Co., Ltd. v. Mario Badescu Skin Care Inc.*, 588 F. App'x 54, 55–56 (2d Cir. 2014) (summary order) (holding under New York law that a plaintiff company that had released all claims related to its purchase of a defendant company's product could not base a rescission claim on allegations that the release had been induced by defendant's false assurances about the product); *Centro Empresarial*, 17 N.Y.3d at 277–78 (holding that shareholders that had released unknown fraud claims arising out of the shareholders' ownership interest in a company could not base a rescission claim on allegations that defendants had induced the release by concealing the true value of that interest).

In urging this Court to reach the contrary conclusion, Defendants argue that the 2006 Action, in the context of which the Settlement arose, involved contract claims based on the alleged misallocation of IBM's revenue between hardware and software—"a separate fraud," *Centro Empresarial*, 17 N.Y.3d at 276, Defendants maintain, from the alleged understatement of

Sales Revenue that Defendants now urge as the basis for rescission. (Dkt. No. 32 at 18–19.) But even if Defendants are correct that IBM's alleged understatement of Sales Revenue is "a separate fraud" from the misallocation claims that motivated the parties to enter into the Settlement,[4] this supposedly distinct, later-discovered fraud cannot support rescission under New York law unless it is "a separate fraud *from the subject of the release*." *Centro Empresarial*, 17 N.Y.3d at 276 (emphasis added). And the parties' release here included not only claims "arising out of or relating to any of the facts or circumstances underlying the [2006] Action" but also claims involving "any other matters related to ACE and/or the [Software Agreement]." (Dkt. No. 7-1 ¶¶ 5(a)–(b).) Defendants cannot deny that IBM's alleged failure to disclose that it was deducting certain sums from the Sales Revenue upon which it based its calculations of Defendants' ACE royalties under the Software Agreement was "related to ACE and/or the [Software Agreement]." (*Id.*) Defendants have thus failed to plead a rescission claim that is plausibly based on a fraud that falls outside the categories of malfeasance Defendants have promised to overlook.[5]

As a result of the foregoing, the Court concludes that IBM is entitled to the dismissal of Count One of Defendants' counterclaims, which seeks rescission of the Settlement. (CC ¶¶ 47–52.) And because the Settlement is therefore enforceable, the Court further concludes that IBM

---

[4] IBM takes issue with Defendants' characterization of the 2006 Action, contending that "[t]he accounting for royalties that Simon wants to make the subject of his new litigation was in fact the central subject matter of the [2006 Action]." (Dkt. No. 28 at 15.) In light of the Court's conclusion that IBM is entitled to judgment on the pleadings even if Defendants' new contract claims are entirely distinct from the claims raised in the 2006 Action, the Court declines to decide which party has the more accurate view of the 2006 proceedings.

[5] The Court notes that Defendants seek leave to amend their counterclaims in the event that the Court concludes that their existing allegations are insufficient to create a plausible inference that the fraud allegations that form the basis for their rescission claim are distinct from the allegations that gave rise to the 2006 Action. (Dkt. No. 32 at 19 n.5, 25.) Because that issue is, as the Court has now explained, immaterial to the outcome here, the Court concludes that the contemplated amendments would be futile and so denies Defendants' request.

is entitled to the dismissal of Count Two of Defendants' counterclaims, which alleges a breach of the Software Agreement (CC ¶¶ 53–60), and to judgment on the pleadings on Count One of its own complaint, which seeks a declaratory judgment that the Settlement bars Defendants' claims for additional ACE royalty payments pursuant to the Software Agreement (Compl. ¶¶ 25–30).

### B.     Breach of the Covenant Not to Sue

The sole remaining matter, then, is Count Two of IBM's complaint, which seeks an award of attorney's fees and costs in the instant action.  (Compl. ¶¶ 31–35.)  Under New York law, "attorneys' fees are not recoverable by the prevailing party [to a litigation] unless such an award is authorized by [an] agreement."  *Sauer v. Xerox Corp.*, 5 F. App'x 52, 57 (2d Cir. 2001) (summary order).  In arguing that such an agreement authorizes it to recover attorney's fees and costs in this action, IBM relies on a provision in the Settlement that reads:

> The releases contained in this Settlement Agreement shall also be deemed a covenant not to sue.  Any breach of this covenant not to sue shall be deemed a breach of this Settlement Agreement and shall entitle the party sued to recoup all attorneys' fees and other fees and costs incurred in connection with the defense of any such action.

(Dkt. No. 7-1 ¶ 6.)  According to IBM, Simon's February 14, 2018 letter, the summons Defendants filed against IBM in New York state court, and Defendants' assertion of their contract counterclaims in this action all breached this covenant not to sue and therefore entitle IBM to recover attorney's fees and costs in this action.  (Dkt. No. 28 at 21.)

The Court agrees with IBM that Defendants' act of filing a summons against it in New York state court constituted a breach of the covenant not to sue, despite the fact that the summons was never served.  *See* N.Y. C.P.L.R. § 306-b (explaining that service of the summons and complaint occurs only *after* "the commencement of [an] action or proceeding").  That said, this breach entitles IBM to only those expenses it incurred "in connection with the defense" of the state-court action.  (Dkt. No. 7-1 ¶ 6.)  IBM has not alleged that it incurred any expenses in

connection with that action, and the Court is doubtful that IBM can prove more than trivial damages arising out of a litigation that was terminated at such an early stage. Nevertheless, to the extent that IBM is able to prove damages, it is entitled to recover them under the Settlement.

The Court disagrees, however, that any other actions taken by Defendants constituted a breach of the covenant not to sue. As for Simon's February 14, 2018 letter, Defendants have pointed to no New York authority—or any authority, for that matter—suggesting that a party breaches a covenant not to sue merely by *threatening* a lawsuit. *Cf. Paramount Pictures Corp. v. Allianz Risk Transfer AG*, 31 N.Y.3d 64, 80 (2018) (noting in dicta that a claim for enforcement of a covenant not to sue "accrue[s] immediately when the [party in breach] file[s] suit"). And under the Settlement, the right to attorney's fees and costs extends only to "the party sued" and covers only expenses "incurred in connection with the defense of [an] action." (Dkt. No. 7-1 ¶ 6.) Absent an actual—as opposed to a threatened—lawsuit, these terms are inapplicable.

Defendants' counterclaims pose a thornier issue. The parties have cited no cases that consider whether a party breaches a covenant not to sue by asserting counterclaims in the context of a preemptive lawsuit initiated by the party claiming breach, and this Court has found none. The dearth of case law on this point, however, is instructive in itself. After all, a covenant not to sue, by its very name, signals an intention to keep certain issues out of court in the first place. *Sue*, *Black's Law Dictionary* (10th ed. 2014) (defining to "sue" as "[t]o *institute* a lawsuit" (emphasis added)). It would be counterintuitive to read such a covenant to allow one party to bring those issues to court and then fault its opponent for litigating them.

In the absence of clearer contractual language, then, the Court concludes that equity weighs against a construction of the Settlement that would penalize Defendants for asserting their counterclaims in response to IBM's lawsuit. The Federal Rules of Civil Procedure provide

that a defendant in federal court *must* raise certain counterclaims that "arise[] out of the transaction or occurrence that is the subject matter of the [plaintiff's] claim" or else risk losing them. Fed. R. Civ. P. 13(a)(1)(A); *cf. Paramount Pictures*, 31 N.Y.3d at 79 (finding a "covenant not to sue claim" and the underlying substantive claims that constituted the alleged breach to be "sufficiently related" to preclude assertion of the "covenant not to sue claim" in state court after the substantive claims had been litigated in federal court). Had Defendants not asserted their contract claims in this litigation, Defendants may well have been foreclosed from asserting them in later proceedings, even had they successfully garnered a judicial declaration in this case—which IBM elected to bring—that they had not released their claims. If the parties' covenant not to sue was, counterintuitively, intended to bar a party that has been haled into court to answer a lawsuit from mounting an effectual defense, the Court sees no evidence to that effect in the materials it is permitted to consider in connection with IBM's motion for judgment on the pleadings.[6]

Accordingly, with the narrow exception of any expenses IBM incurred in defending against Defendants' quickly aborted state-court action, the Court has no basis on the present record for departing from the ordinary rule of New York law that the parties to a lawsuit are to bear their own attorney's fees and costs.

## IV.     Conclusion

For the foregoing reasons, IBM's motion for judgment on the pleadings is GRANTED IN PART and DENIED IN PART. Specifically, IBM's motion is GRANTED insofar as IBM seeks

---

[6] The Court notes in addition that IBM's complaint claims only that "Simon and MGV breached the covenant not to sue . . . by serving the [February 14, 2018] Claim Letter and filing the 2018 State Court [summons] against IBM." (Compl. ¶ 32.) The Court has already addressed those theories of breach, and IBM has not sought to amend its complaint to allege a theory of breach that is predicated on Defendants' counterclaims.

the dismissal of Defendants' counterclaims, judgment on Count One of its complaint, and judgment on Count Two of its complaint with respect to attorney's fees and expenses incurred in defending against the state-court action filed by Defendants.  However, IBM's motion is DENIED insofar as IBM seeks judgment on Count Two of its complaint with respect to any other fees and expenses.  IBM is directed to file a letter on or before April 12, 2019, informing the Court what, if any, fees and expenses it seeks and whether any other issues remain for this Court to resolve.

The Clerk of Court is directed to close the motion at Docket Number 27.

SO ORDERED.

Dated: March 27, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge